UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

POSR A. POSR                                         COMPLAINT

                Plaintiff,                   JURY TRIAL DEMANDED

        vs

P.O. UEBERBACHER, POLICE DEPARTMENT OF
THE CITY OF NEW YORK, RAYMOND KELLY,
CITY OF NEW YORK, MICHAEL BLOOMBERG,
STATE OF NEW YORK, DAVID PATTERSON.

                Defendants

      I, Posr A. Posr, am fully familiar with the facts and circumstances surrounding this case and I state, under penalty of perjury, the following:

PRELIMINARY

Plaintiff is Posr A. Posr

Defendants:
[1] P.O. Ueberbacher, a New York City Police Officer
[2] Police Department of the City of New York
[3] Raymond Kelly, as Commissioner of the New York City Police Department.
[4] City of New York
[5] Michael Bloomberg, as Mayor of New York City,
[6] State of New York
[7] David Patterson, as Governor of New York

      [A] Plaintiff, of African ancestry, otherwise known as Black, seizure in this complaint took place at approximately 11:03 am between Marcus Garvey Park West and Malcolm X boulevard Monday, 2009.03.09. A Notice of Claim was filed on 2009.03.11. {Exhibit 1} No defendant requested a 50h hearing.

      [B] The New York Times article of 2010.03.01, "Watching Certain People" {Exhibit 2} cites apprx. 1.5 million people of African ancestry who were at least seized, and probably searched, between the years of 2004 & 2009. Racial profiling is a real phenomenon in the United States, the City of New York, and in the village of Harlem. Tens of thousands of Blacks in Harlem have been doing nothing but lawfully minding their businesses, walking in Harlem {and other predominantly Black areas of New York} when police seized them, searched them, and entered information of those seized and

RECEIVED MAR 04 2010 PRO SE

1

searched in a database. Only a very small percentage of those stopped have resulted in arrests.

[C] Commissioner Raymond Kelly, 2006, ordered the compilation of the database. Commissioner Kelly was aware since, at least 2008, that the overwhelming majority of those targeted for seizure and search were people of African descent.

{D} This large number of Blacks stopped and the low number of arrests made indicate {along with factual and anecdotal data compiled by the American Civil Liberties Union} racially motivated systematic police seizures & searches without reasonable or probable cause to have believed that those seized had committed or were about to commit crimes.

[E] This high number of stops compared to the low number of arrests ratio, and the complaints that have accompanied the ratio, amount to a triably articulable city & state-wide policy of harassing Blacks with unreasonable seizures and searches in which those stopped are subjects of fishing expeditions intended to find reasons to arrest when no reasonable, probable, or lawfully articulable suspicion of crime exists.

[F] Def. Bloomberg, before 2009, was personally made aware of the policy and results of targeting "databasing" law abiding Africans for seizure and search and the policy and results were condoned by the Mayor.

[G] State Police are also compiling like databases under the same policy in which NYC Police are compiling its database.

[H] Def. Patterson, before 2009, was personally made aware of the policy and results of targeting "databasing" law abiding Africans for seizure and search and the policy and results were condoned by the Mayor.

[1] Defendant Ueberbacher {def. U}, shield number 5063, was on duty as a New York City Police Officer.
[2] Defendant U was on duty in a marked police vehicle.
[3] Defendant U was on duty in a marked and moving police vehicle on 123rd street, which vehicle was moving west between Marcus Garvey Park West and Malcolm X boulevard.
[4] While riding in said vehicle in said westerly direction, the defendant U. observed plaintiff.
[5] As the defendant U. observed plaintiff, plaintiff was carrying a red bag.
[6] Def. U., between Marcus Garvey Park West and Malcolm X boulevard, exited the vehicle he was riding in.
[7] After exiting the aforesaid vehicle at the aforesaid place and time, defendant U. approached plaintiff.
[8] After exiting the aforesaid vehicle and approaching, plaintiff, defendant U. asked plaintiff where plaintiff had come from.
[9] Plaintiff responded by asking def. U. why he wanted to know or Was there a problem or some such question.
[10] Def. U. then stood between plaintiff and Malcolm X boulevard.
[10.1] Def. U. stood directly and deliberately in plaintiff's path.
[10.2] Def. U stood in plaintiff's path for the purpose of seizing plaintiff from plaintiff's chosen path.
[11] Def. U. asked plaintiff for identification.

[11.5] Plaintiff responded by asking if a crime had been committed.
[12] Def. U. stated he saw plaintiff put his bag down at 10 west 123rd St and put something in the bag.
[13] Plaintiff asked if that was a crime.
[14] Def. U. said it was not a crime.
[15] Def. U. informed plaintiff that there had been a lot of burglaries in the area.
[15.1] Def. U. knew there were not a lot of burglaries in the area.
[16] Plaintiff asked if a burglary at 10 West 123rd St. had been reported.
[16.1] Def. U. knew there was no burglary at 10 West 123rd St. had been reported.
[17] Def. U. informed plaintiff that he was investigating a burglary.
[18] Def. U. knew def. U was not investigating a burglary.
[18.1] Plaintiff asked def. U. if plaintiff fit the description of a burglar.
[18.2] Def. U. knew plaintiff did not fit the description of a burglar involved in a burglary in progress.
[19] Def. U. did not say plaintiff fit the description of a burglar.
[20] Plaintiff asked def. U. if plaintiff was free to go.
[21] Def. U. said "No."
[22] Plaintiff said "if this were a white neighborhood, this wouldn't be happening."
[23] Def. U. angrily said "Do you want me to stop a white guy?"
[24] Plaintiff said "Yes".
[24.5] Plaintiff was in fear for his life.
[25] Plaintiff pointed out a white person.
[26] Def. U. refused to stop the white guy saying, "but he has a clipboard."
[26.1] Def. U. knew that a white man could have a clipboard and still have committed, be committing, or be about to commit a crime.
[27] Plaintiff asked def. U. if plaintiff was free to go.
[28] Plaintiff said "No."
[29] Plaintiff asked to see def. U's supervisor.
[29.5] Plaintiff made a phone call to 911 from phone number 646 359 5663.
[30] Four uniformed officers arrived.
[31] Plaintiff asked them if plaintiff was free to go.
[32] One of the four semi-circling officers told plaintiff no.
[32.5] Plaintiff was put in further fear of his life.
[33] Defendant's supervisor arrived.
[34] Def.s supervisor arrived @ the corner of Malcolm X boulevard and 123rd st. about 5 minutes after plaintiff's 911 call.
[35] Def. U. spoke with his supervisor for apprx. 2 minutes.
[36] Def. U.'s supervisor spoke with plaintiff for apprx. 2 minutes.
[37] Def. U.'s supervisor said plaintiff was free to go and plaintiff went.
[38 In New York City from { date known to aclu} {to the present} there have been {the number of} arrests having been made from {number of un-arrested} seized yet un-arrested African pedestrians on Harlem's public streets.
[39] There was no probable cause to have stopped the aforementioned pedestrians of African descent who were not arrested.
[38] The New York City Police Department has an unwritten policy of permitting its officers to seize Black pedestrians in Harlem without probable cause.

3

[39] The City of New York has an unwritten policy of seizing Blacks in Harlem without reasonable causes to believe that those seized have committed or about to commit crimes.
[40] On 2009.03.Plaintiff has requested through FOIL, the number of burglaries in a specified vicinity of 123rd Street between Marcus Garvey Park West & Malcolm X Boulevard.
[41] The New York City Police Department has yet to to deny the request.
[42] The New York City Police Department has yet to to deny the request in order to prevent plaintiff from verifying that def. Ueberbacher's claim that "there have been a lot of burglaries in the area" was a pretense for racially profiling me.
[43] These profiling techniques are and have been occurring throughout the State of New York in various forms as indicated by the similar acts throughout the State of New York.
[43.1] Defs. U and Kelly divested plaintiff of honor.
[43.2] Defs. U and Kelly divested plaintiff of human worth.
[43.3] Defs. U and Kelly divested plaintiff of human value.
[43.4] Defs. U and Kelly divested plaintiff of the esteem to which the law holds human beings.
[43.5] Defs. U and Kelly divested plaintiff of the dignity to which humans of worth are held.

## AS AND FOR A FIRST STATUTORY CAUSE OF ACTION
## {PRETENSES}

[44] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for a violation of Article II § II of the New York State Civil Rights Law in that def. U became a rogue state power when he exercised authority under the pretenses of [1] there having been "a lot of burglaries in the area" and [2] "investigating a burglary" in the form of seizing, stopping, interrogating, intimidating, and otherwise interfering with and impeding plaintiff's right to [1] move from place to place and [2] be secure in his person, papers, and effects.

## AS AND FOR A SECOND STATUTORY CAUSE OF ACTION
## {RACIAL MOTIVATION}

[45] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for a violation of Article 1 § 11 of the New York State Constitution in that def. U., because of plaintiff's race and color, denied plaintiff equal protection of his right to be secure in his person, papers, and effects from unreasonable seizures as defined in Article 1 § 12 of the New York State Constitution.

## AS AND FOR A THIRD STATUTORY CAUSE OF ACTION
## {SECURE IN PERSON}

[46] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for a violation of Article 1 § 12 of the New York State Constitution in that def. U., denied plaintiff protection of his right to be secure in his person, papers, and effects from unreasonable seizures by seizing plaintiff without an articulable, reasonable, or probable cause ground upon which to have suspected that [1] a burglary had been or was about to be committed at 10 West 123rd Street, Manhattan, New York, and [2] that plaintiff had or was about to commit such burglary.

### AS AND FOR A FOURTH STATUTORY CAUSE OF ACTION
### {Speech}

[47] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for a violation of Article §I 8 of the New York State Constitution in that after plaintiff accused def. U., of racially profiling plaintiff, def U. {who at first offered but then refused to stop a white man because the white man was carrying a clipboard} then denied plaintiff his freedom to go in order to retaliate against plaintiff for accusing def. U. of racial profiling.

### AS AND FOR A FIFTH STATUTORY CAUSE OF ACTION
### {PAIN & SUFFERING}

[48] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for pain an suffering.

### AS AND FOR A SIXTH STATUTORY CAUSE OF ACTION
### {PUNITIVE DAMAGES}

[49] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $200,000.00 for punitive damages.

### AS AND FOR A SEVENTH STATUTORY CAUSE OF ACTION
### {NYPD POLICY}

[50] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. New York City Police Department in the amount of $100,000.00 for adopting, condoning & executing a policy of seizing Blacks walking in Harlem without probable cause to believe such Blacks have or are about to commit a crime.

### AS AND FOR A EIGHTH STATUTORY CAUSE OF ACTION
### {NYC POLICY}



[51] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. New York City in the amount of $100,000.00 for adopting & executing a policy of seizing Blacks walking in Harlem without probable cause to believe such Blacks have or are about to commit a crime.

[52]     AS AND FOR A NINTH STATUTORY CAUSE OF ACTION
{PURGE OF DATABASE}

Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. New York City Police Department for an Order directing the City & State purge and complete erasure of the information in the "profiling database" such that that information is and remains forever non-retrievable.

AS AND FOR A TENTH [FIRST FEDERAL] CAUSE OF ACTION
[4TH AMENDMENT SEIZURE]

[52.1] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for a 4th Amendment violation of plaintiff's right to be secure in his person, papers, and effects in that def. U. seized plaintiff without reasonable cause to believe a crime had been or was about to be committed and without reasonable cause to believe that plaintiff committed a crime.

AS AND FOR A ELEVENTH [SECOND FEDERAL] CAUSE OF ACTION
[42 U.S.C § 1981 WHITE MAN TREATMENT]

[53] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for a violation of 42 U.S.C § 1981 in that def. U., denied plaintiff the same right to be secure in his person, papers, and effects from unreasonable seizures as is enjoyed white citizens in that def. U. refused to seize a white person as he had seized plaintiff, after offering to do so.

AS AND FOR AN TWELFTH [THIRD FEDERAL] CAUSE OF ACTION

[54] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff sues def. U. in his official and personal capacities in the amount of $80,000.00 for a violation of 42 U.S.C. § 1983 in that def. U. under color of the state burglary statutes deprived plaintiff, under color of law, of each and every aforesaid right, privilege, secured by the Constitution and laws,

AS AND FOR A THIRTEENTH [FOURTH FEDERAL] CAUSE OF ACTION
[14TH AMENDMENT]

[55] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff separately sues def. U. in his official and personal capacities, the NYC Police



Dept., New York City, and New York State in separate amounts of $80,000.00 for a violation of the Fourteenth Amendment § 1 in that all of these defendants have deprived plaintiff of liberty without due process of law and denied plaintiff the equal protection of, but not limited to, the laws cited in the causes of action.

## AS AND FOR A FOURTEENTH [FIFTH FEDERAL] CAUSE OF ACTION
## [14TH AMENDMENT]

[56] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff separately sues, for $80,000.00 each, defs. U. in his official and personal capacities, and Raymond Kelly, in his official and personal capacities, for a violation of plaintiff's Ninth Amendment right to dignity, in that these defendant's actions, in [1] racially profiling plaintiff for unwanted seizure and search, and [2] racially "databasing" plaintiff for future crimes, used state power to assault plaintiff's value, esteem, worth, and nature as a human being, which assault amounted to an assault on plaintiff's dignity, which is protected by the Ninth Amendment.

## AS AND FOR A FIFTEENTH [SIXTH FEDERAL] CAUSE OF ACTION
## [9TH AMENDMENT]

[57] Plaintiff reiterates each, every, and all previous paragraphs as and if stated in full. Plaintiff separately sues defs. U.& Kelly in their official and personal capacities, for a declaratory judgment that the Ninth Amendment protects the individual right to dignity and that, for purposes of apprehending criminals for future, as yet uncommitted & arguably uncontemplated crimes, [1] racial group profiling and [2] racial group "databasing" necessarily assaults an individual's dignity as an individual human being.

WHEREFORE, the defendants have engaged in acts designed to deprive plaintiff, and hundreds of thousands of others, of their Constitutional and Statutory entitlements, in the manners referred to above, plaintiff respectfully requests a judgment in his favor and what ever other favor the court deems fit and proper.

_[signature]_
Posr A. Posr
62 East 125th Street
Apt. 3G
NYC 10035
646 359 5663

dated: 2010.03.02 / 03

Affirmed to before me on this Third day of March, 2010

_[signature]_
NOTARY PUBLIC

NO. 01X6182950
MY COMMISSION EXPIRES 03-10-2012

Exh. 1

NOTICE OF CLAIM

Posr v Ueberbacher: shield 5063

On Monday, 2009.03.09, at approximately 11:03 a.m. I was peacefully walking west on 123rd st. between Marcus Garvey Park North and Malcolm X blvd. minding my business.

Police Officer Ueberbacher {UB}, shield 5063, got out of a patrol car about 30 yds. from the corner and asked me where was I caming from and stood intimidatingly in my path.

Among other things, he said he saw me put my bag down at 10 West 123rd St. and that he saw me put something in my bag. I asked UB if that was a crime and he said no and that there were a lot of burglaries in the area and that he was investigating a burglary. I asked him if there was a report of a burglary at 10 west 123rd st. or if i fit the description of someone suspected of having committed a burglary, he refused to answer.

The subject of racial profiling came up and he became highly irritated and angry raising his voice at me while taking a step closer to me, which further put me in fear of my life.

Then, in order to prove that he was not racially profiling me, he asked me if i wanted him to stop a white guy and i said yes. A white guy happened to be walking east and i requested UB to stop him. UB refused to stop the caucasian demonstrating that the offer of stopping a caucasian was a false offer, because, in fact, UB was racially profiling me.

Eventually i asked him if i was under arrest and he said no. Then i asked him if i was free to go and he said no, he's investigating a burglary. Because i felt he would shoot me if attempted to leave i asked to speak to his supervisor, whom he called, and i called 911 from phone number 646 359 5663.

Before the sgt. arrived i asked several other times if i was free to go and Ueberbacher and another officer, who had arrived said no, as now four officers

formed a semi-circle around me, which further put me in fear of my life.

A sgt arrived, heard my account of the events, and answered yes when i asked if i was free to go. I left.

First causes of action against defendants {defs} Ueberbacher {UB} and NYC are for a seizure in violation of the 4th Amendment, and State Statutes prohibiting unreasonable sezures in the amount of the Federal Statutory minimum for federal cases of this type, and a declaration that plaintiff's behavior does not constitute probable cause. Second causes of action against UB and NYC are for a violation of my equal protection rights both state and federal, in that UB racially profiled me for seizure. This cause possibly within range of 42 U.S.C § 1981, in the amount of the Federal statutory minimum. Third causes of action against UB and NYC are for violating my first amend. rights in that after UB refused to stop the caucasian, he further refused to free me to go in retaliation for having challenged his racial profilation of me, in the amount of Fed. Stat. minimum.

X *(signature)*
Posr A. Posr
1173 2nd Ave.
Apartment 2n
[Not the P.O. Box Place]
NYC 10065

Affirmed to before me
this _11_ day of March, 2009

*(signature)*

JOSEPH V. CAPUA
Notary Public, State of New York
No. 24-4849275
Qualified in Kings County
Commission Expires Dec. 31, 2009

Exh. 2

Welcome to TimesPeople  
Get Started

TimesPeople recommended: A Word From the Wise  2:34 PM  Recommend

HOME PAGE | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS          Log In | Register Now

# The New York Times

## Opinion

Search All NYTimes.com

WORLD | U.S. | N.Y./REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS

EDITORIALS  COLUMNISTS  CONTRIBUTORS  LETTERS  THE PUBLIC EDITOR  GLOBAL OPINION

OP-ED COLUMNIST

# Watching Certain People

By BOB HERBERT  
Published: March 1, 2010

More Articles in Opinion »

From 2004 through 2009, in a policy that has gotten completely out of control, New York City police officers stopped people on the street and checked them out nearly three million times, frisking and otherwise humiliating many of them.



Bob Herbert

Go to Columnist Page »

**Readers' Comments**

Readers shared their thoughts on this article.  
Read All Comments (232) »

SIGN IN TO RECOMMEND  
TWITTER  
COMMENTS (232)  
SIGN IN TO E-MAIL  
PRINT  
SHARE

Upward of 90 percent of the people stopped are completely innocent of any wrongdoing. And yet the New York Police Department is compounding this intolerable indignity by compiling an enormous and permanent computerized database of these encounters between innocent New Yorkers and the police.

Not only are most of the people innocent, but a vast majority are either black or Hispanic. There is no defense for this policy. It's a gruesome, racist practice that should offend all New Yorkers, and it should cease.

Police Department statistics show that 2,798,461 stops were made in that six-year period. In 2,467,150 of those instances, the people stopped had done nothing wrong. That's 88.2 percent of all stops over six years. Black people were stopped during that period a staggering 1,444,559 times. Hispanics accounted for 843,817 of the stops and whites 287,218.



"ADDS VALUE BEYOND CONTENT."
— Mashable.com

**MOST POPULAR**

E-MAILED | BLOGGED | SEARCHED

1. Scholar's School Reform U-Turn Shakes Up Debate
2. David Brooks: The Hard and the Soft
3. Cases: Old Age, From Youth's Narrow Prism
4. Personal Health: Even More Reasons to Get a Move On
5. Depression's Upside
6. Don't Tell the Kids
7. Human Culture, an Evolutionary Force
8. Want a Better Listener? Protect Those Ears
9. The Pour: Letting a Grape Be a Grape
10. Well: In Obesity Epidemic, What's One Cookie?

Go to Complete List »

While crime has been going down, the number of people getting stopped by the police is going up. Last year, more than 575,000 stops were made — a record. But 504,594 of those stops were of people who had done nothing wrong. They had committed no crime, were issued no summonses and were carrying no weapons or illegal substances.

Still, day after day, the cops continue harassing and degrading these innocent New Yorkers, often making them line up against walls, or lean spread-eagled on the hoods of cars, or sprawl face down in the street to be searched like criminals in front of curious, sometimes frightened, sometimes giggling, sometimes outraged onlookers.

If the police officers were treating white middle-class or wealthy individuals this way, the movers and shakers in this town would be apoplectic. The mayor would be called to account in an atmosphere of thunderous outrage, and the police commissioner would be gone.

But the people getting stopped and frisked are mostly young, and most of them are black or brown and poor. So Police Commissioner Ray Kelly could feel completely comfortable with his department issuing the order in 2006 that reports of all stops and frisks be

forwarded and compiled "for input into the Department's database."

"They have been collecting the names and all sorts of other information about everybody who is stopped and frisked on the streets," said Donna Lieberman, the executive director of the New York Civil Liberties Union, which is fighting the department's stop-and-frisk policy and its compiling of data on people who are innocent. "This is a massive database of innocent, overwhelmingly black and Latino people," she said.

Police Commissioner Kelly has made it clear that this monstrous database, growing by a half-million or so stops each year, is to be a permanent feature of the department's operations. In a letter last summer to Peter Vallone Jr., the chairman of the City Council's Public Safety Committee, the commissioner said:

"Information contained in the stop, question and frisk database remains there indefinitely, for use in future investigations. Therefore, there are no existing Police Department guidelines that mandate the removal of information once it has been entered into the database."

He added, "Information contained within the stop, question and frisk database is used primarily by department investigators during the course of a criminal investigation."

So the department is collecting random information on innocent, primarily poor, black and brown New Yorkers for use in some anticipated future criminal investigation. But it is not collecting and storing massive amounts of information on innocent middle-class or wealthy white people. Why is that, exactly?

Councilman Vallone is a supporter of the stop-and-frisk policy, but he is concerned about the innocent people in the database. As he told me on Monday, "I don't support the indefinite keeping of this information regarding people who were not arrested or charged with any crime."

The Police Department has no intention of changing its policy. A spokesman for Commissioner Kelly told me that information collected when the police stop an innocent individual "may be useful" in future investigations. The stored data may become useful "in the same way" that license plate information is useful, he said.

He cited the hypothetical example of someone in the course of a criminal investigation saying that he or she was at "a certain place at a certain time." The information permanently stored in the stop-and-frisk database, he said, could help the police determine if "they were or they weren't."

His example would suggest that the innocent people stopped are nevertheless permanently under suspicion, which is, of course, the case.

A version of this article appeared in print on March 2, 2010, on page A23 of the New York edition.

Past Coverage

Deal on Quick Blood Test If Breath Test Is Refused (November 14, 2009)
Police Get Added Order: Stop, Frisk and 'Explain' (May 1, 2009)
City Police Stop Whites Equally But Frisk Them Less, a Study Finds (November 21, 2007)
METRO BRIEFING | NEW YORK; Manhattan: Suing To Get Police Data (November 14, 2007)