UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
POSR A. POSR,

                        Plaintiff,                          10 CIV 2551 (RPP)

            -against-                              **OPINION & ORDER**

THE CITY OF NEW YORK; MAYOR MICHAEL
BLOOMBERG, in his individual and official
capacity; the NEW YORK POLICE DEPARTMENT;
NEW YORK POLICE COMMISSIONER
RAYMOND KELLY, in his individual and official
capacity; NEW YORK POLICE OFFICER PETER
UEBERACHER, in his individual and official
capacity; NEW YORK POLICE OFFICER PEDRO
RIVERA, in his individual and official capacity;
and POLICE OFFICER CHRISTINE PIMENTEL,
in her individual and official capacity,

                        Defendants.
------------------------------------------------------------------X
**ROBERT P. PATTERSON, JR., U.S.D.J.**

        Pursuant to 42 U.S.C. § 1981, § 1983, and New York State law, pro se plaintiff Posr A.

Posr brings this action against the City of New York (the "City"), New York City Mayor

Michael Bloomberg, the New York City Police Department ("NYPD"), NYPD Commissioner

Raymond Kelly, and NYPD Officers Peter Ueberacher, Pedro Rivera, and Christine Pimentel

(collectively, Defendants).  (See Am. Compl. at 1, April 2, 2012, ECF No. 42.)  Defendants

move for dismissal of several of Plaintiff's claims under Rule 12(c) of the Federal Rules of Civil

Procedure and for summary judgment under Rule 56 on all of Plaintiff's remaining claims.  (See

Mot. to Dismiss Am. Compl., ECF No. 46; see also Mem. in Supp. of Mot. to Dismiss ("Dismiss

Mem."), ECF No. 47 (incorporating arguments raised in Mem. in Supp. of Mot. for Summ. J.

("Summ. J. Mem."), ECF No. 27).)  For the reasons stated below, the Court grants Defendants'

motions, dismisses Plaintiff's claims, and enters summary judgment in favor of Defendants.

## I.      FACTUAL BACKGROUND

### A.  The Incident at West 123rd Street on March 9, 2009

Describing himself as "a male of Black African ancestry," (Am. Compl.  1), Plaintiff

alleges that, at approximately 11:03 a.m. on Monday, March 9, 2009, he emerged from the

Pelham Fritz Recreation Facility in Marcus Garvey Park, walked one block north, turned onto

123rd Street, and started walking west, (id. ¶¶ 1-2); that he then stopped walking at 10 West

123rd Street,[1] where he put his gym bag down on "a 1.5 foot concrete cube," which he viewed as

marking "the boundary between the public sidewalk . . . and the courtyard of [a] private

property;" and that he next unzipped his gym bag, retrieved his wallet from inside his bag,

zipped the bag closed, lifted the bag, and proceeded west towards his residence at 136 West

123rd Street.  (Id. ¶¶ 3, 5-7.)

In his response declaration, Officer Ueberacher stated that, on March 9, 2009, he was on

123rd Street, driving west in a marked patrol car, when he observed Plaintiff as follows:

> I observed Plaintiff Posr A. Posr standing in the courtyard of 6
> West 123rd Street in Manhattan.  The front door of that location
> was open and I observed Plaintiff placing unidentified objects into
> a red duffle bag.  I had been advised by my command that there
> had been a recent spike in burglaries in that location.  I was further
> advised that suspects committing these burglaries often strike
> during the midday hours and steal items that can easily be
> concealed in bags and knapsacks.

---

[1]Plaintiff and Defendants both agree that Plaintiff was on West 123rd Street in the vicinity of Marcus Garvey Park West and Malcolm X Boulevard at approximately 11:00 a.m. on March 9, 2009.  (See Am. Compl. at 1; Answer to Am. Compl. ("Answer") ¶ 8, ECF No. 43.)  Plaintiff asserts, however, that he stopped walking in front of 10 West 123rd Street, (Am. Compl. ¶ 3), whereas Officer Ueberacher stated that he observed Plaintiff standing at 6 West 123rd Street, (Decl. of Brian J. Farrar in Supp. of Mot. for Summ. J. ("Farrar Summ. J. Decl.") Ex. C ("Ueberacher Decl.") ¶ 2, July 22, 2011, ECF No. 28).  Neither Plaintiff nor Defendants discuss the discrepancy between these addresses, and so the Court finds that the difference is immaterial to resolving the issues presented here.  In addition, 10 West 123rd Street and 6 West 123rd Street are both located between Marcus Garvey Park West and Malcolm X Boulevard, which is also called Lenox Avenue.  In their letters and briefings, parties refer to both of these street names, but for simplicity, the Court adopts Malcolm X Boulevard as its reference.

(Ueberacher Decl. ¶ 2; see also Am. Compl. ¶¶ 9-12.)  After observing Plaintiff pick up his bag

and start walking, Officer Ueberacher pulled his car over and approached Plaintiff.  (Ueberacher

Decl. ¶ 3; Am. Compl. ¶¶ 12-15.)

Officer Ueberacher declared that, after he approached Plaintiff, the following interaction

ensued:

> I asked Plaintiff whether he lived at 6 West 123rd Street and he
> informed me that he did not.  I then asked Plaintiff why he was
> standing in front of that location and he refused to answer.  I asked
> Plaintiff for his identification but he also refused.  I explained to
> Plaintiff that I was asking these questions because there ha[d] been
> a high incidence of burglaries in that particular area.

(Ueberacher Decl. ¶ 4.)

In his Amended Complaint, Plaintiff alleges that Officer Ueberacher observed him "put

his bag down, bend over his bag, move his arms about his bag, pick up the bag, and proceed

west," (Am. Compl. ¶ 12); that Officer Ueberacher then approached and asked Plaintiff where he

had come from, (id. ¶¶ 14-15); that Plaintiff did not respond to the question, and instead asked

"why [Officer Ueberacher] wanted to know, or was there a problem, or some such question;" (id.

¶ 16); that Officer Ueberacher thereafter asked him for identification, (id. ¶ 20), but that, rather

than turning over any identification, Plaintiff asked if a crime had been committed, (id. ¶ 21);

that Officer Ueberacher responded to the question by stating Plaintiff had been observed putting

a duffel bag down and putting something into the bag, (id. ¶ 22); that Plaintiff asked Officer

Ueberacher if doing so was a crime, (id. ¶ 23); and that Officer Ueberacher replied, "it was not a

crime," (id. ¶ 24), but that "there had been a lot of burglaries in the area," (id. ¶ 25).

Next, Plaintiff alleges that he inquired "if a burglary at 10 West 123rd Street had been

reported," (id. ¶ 27); that Officer Ueberacher responded that "he was investigating a burglary."

(id. ¶ 29); that Plaintiff queried if he "fit the description of a burglar," (id. ¶ 31); but that Officer

Ueberacher "did not say Plaintiff fit the description of a burglar," (id. ¶ 33); that he told Officer

Ueberacher "if this were a white neighborhood, this wouldn't be happening," (id. ¶ 36); that

Officer Ueberacher responded, "Do you want me to stop a white guy?" (id. ¶ 37); that Plaintiff

replied yes, and pointed out a white person whom he thought Officer Ueberacher should stop,

(id. ¶¶ 38, 40); and that Officer Ueberacher refused to stop this white person because the person

was carrying a clipboard, (id. ¶ 41).

Plaintiff further alleges that, after Officer Ueberacher allegedly refused to stop the white

passerby, Plaintiff asked to speak with Officer Ueberacher's supervisor, (id. ¶ 45; see also

Ueberacher Decl. ¶ 5); that Officer Ueberacher placed a call on the radio for his sergeant,

Yolanda Cuadrado, to respond, (id.); that while Officer Ueberacher was on the radio, Plaintiff

called 911 on his cell phone, (Am. Compl. ¶ 48); that, within minutes of Plaintiff's 911 call, four

uniformed police officers arrived on the scene, (id. ¶ 49); that these officers stood around him in

a threatening semi-circle, (id. ¶ 51); that Sergeant Cuadrado arrived shortly thereafter and spoke

with Officer Ueberacher and then with Plaintiff, (Am. Compl. ¶¶ 53-57; Ueberacher Decl. ¶¶ 5-

6); and that she then spoke with Plaintiff and told him that he "was free to go;" and that, as soon

as she did so, he left the scene, (Am. Compl. ¶ 57).

Plaintiff alleges, however, that prior to Sergeant Cuadrado telling him that he was free to

go, he twice asked Officer Ueberacher if he could go, (id. ¶¶ 34, 43); that he also asked the four

responding 911 officers if he could go (id. ¶ 50); and that, each time he asked, he was told that he

was not free to go.  (Id. ¶¶ 35, 44, 51).  Officer Ueberacher disputed this contention, stating:

> The entire interaction with Plaintiff lasted less than ten minutes.
> Plaintiff was not handcuffed during this encounter.  No physical
> force was used on Plaintiff, no threats were made, and Plaintiff
> was free to leave at any time.

(Ueberacher Decl. ¶ 7.)

Following the March 9, 2009 incident on West 123rd Street, Officer Ueberacher

completed a report for the NYPD Stop, Question & Frisk System (the "Stop & Frisk Report").

(See Letter from Defs. to the Court dated Nov. 16, 2012, Ex. B, ECF No. 62.)  In the report,

Officer Ueberacher wrote that he had stopped a person, whose name was listed as "Unknown,"

after observing that person for two minutes.  (Id.)  The report indicated that the stop had lasted

for seventeen minutes and included the following notes:

> *Circumstances Leading to Stop*
> - Suspects, Actions - Fits Description;
> - Suspects, Actions - Other - At location putting unknown
>   objects in duffle bag.
>
> *Additional Factors*
> - Report from Victim/Witness/Officer;
> - Area has high incidence of reported offense;
> - Evasive, false, or inconsistent responses to officers' questions;
> - Other: Door to 6 West 123rd Street left open where subject 1st
>   observed.

(Id.)

## B.  Plaintiff's Freedom of Information Law Act Complaints

### i.  March 12, 2009 Request

On March 12, 2009, three days after the incident with Officer Ueberacher, Plaintiff

submitted a request pursuant to New York State's Freedom of Information Law Act ("FOIL").

seeking: (1) the audio tape and SPRINT Report of the 911 call that he had made from his cell

phone on March 10, 2009;[2] (2) information on the number of areas in Harlem that the NYPD had

designated as "high burglary" between March 10, 2008 and March 10, 2009; and (3) information

on the NYPD's guidelines for designating an area as "high burglary."  (See Letter from Defs. to

Court dated Feb. 23, 2012, Ex. B ("Pl.'s 2009 FOIL File") at 2-5, ECF No. 39; see also Am.

---

[2]Plaintiff entered the wrong date in his FOIL request as the 911 call that Plaintiff made during his encounter with
Officer Ueberacher occurred on March 9, 2009, not on March 10, 2009.  (See Am. Compl. ¶ 77.)

Compl. ¶¶ 68-70, 76-77.)  Plaintiff alleges that he submitted this FOIL request to Officer Rivera,

and that after he did so, Officer Rivera "refused to time-stamp or otherwise render a receipt"

acknowledging the submission of Plaintiff's request.  (Am. Compl. ¶¶ 68-72.)

On April 13, 2009, Sergeant James Russo sent Plaintiff a letter acknowledging the receipt

of Plaintiff's March 12, 2009 FOIL request.  (Id. at 10.)  In the letter, Sergeant Russo informed

Plaintiff that, "[d]ue to the large volume of pending FOIL requests, which are processed in the

order in which they are received, and due to the fact that NYPD records are kept in many offices

located in five counties," a determination on Plaintiff's request would not be reached until July

17, 2009.  (Id.)  A few weeks later, on April 29, 2009, Sergeant Russo assigned Plaintiff's FOIL

request to Officer Pimentel.  (Id. at 6-7.)  Thereafter, the Tape and Records Unit of the NYPD

Communications Division searched for the record of a 911 call made from Plaintiff's cell phone

on March 10, 2009—the date that Plaintiff's FOIL request had specified—but the search

returned "negative results."  (Id. at 2-5, 7-8.)  On August 11, 2009, Sergeant Russo sent Plaintiff

a letter stating that the NYPD FOIL Unit had been "unable to locate records responsive to [his]

request based on the information provided."  (Id. at 9.)  The letter advised that, if Plaintiff

desired, he could appeal the decision in writing within thirty days.  (Id.)  However, Plaintiff does

not claim, nor does his FOIL file indicate, that he appealed this decision.

ii.  April 13, 2012 Request

On April 13, 2012, Plaintiff filed an additional FOIL request seeking verification that he

had "signed in" to the Pelham Fritz Recreation Facility in Marcus Garvey Park on March 9,

2009.  (See Nov. 16, 2012 Letter Ex. A ("Pl.'s 2012 FOIL File").)  In response, on June 12,

2012, a New York City Parks & Recreation Records Access Officer mailed Plaintiff a copy of

his "Membership Usage Report."[3]  (Id. at 2, 4-11.)  The Membership Usage Report showed that Plaintiff had signed in to the Pelham Fritz Recreation Facility on March 9, 2009 at 9:59 a.m.  (Id. at 5.)  The report did not reflect the time when Plaintiff left the facility.  (Cf. id.)

## II.   PROCEDURAL HISTORY

### A.  The Complaint

On March 4, 2010, Plaintiff filed his original Complaint against the City of New York, Mayor Bloomberg, the NYPD, Commissioner Kelly, and Officer Ueberacher.[4]  (See Orig. Compl. at 1, ECF No. 2.)  Pursuant to 42 U.S.C. § 1983, the Complaint alleged that Officer Ueberacher had violated Plaintiff's right to be free from unreasonable seizure under the Fourth Amendment, his right to equal protection under the Fourteenth Amendment, and his right to be free from an assault on his dignity under the Ninth Amendment.  (Id. ¶¶ 52.1-57.)  The Complaint further alleged that Officer Ueberacher had violated 42 U.S.C. § 1981, (id. ¶ 53), as well as numerous New York State laws, (id. ¶¶ 44-52).  In addition, the Complaint alleged that the NYPD and the City of New York, with support from Mayor Bloomberg and Commissioner Kelly, had violated Plaintiff's Fourteenth and Ninth Amendment rights by "adopting, condoning, and executing a policy of seizing Blacks walking in Harlem without probable cause to believe such Blacks ha[d committed] or [we]re about to commit a crime."  (Id. ¶¶ 50-51.)

On July 22, 2011, Defendants filed a Rule 56 motion arguing that they were entitled to summary judgment because:

---

[3]On November 16, 2012, Defendants submitted a letter to the Court, copied to Plaintiff, stating that the "NYC Parks Department . . . attempted to provide Plaintiff with copies of his attendance records, pursuant to Plaintiff's April 13, 2012 FOIL request, [but] the mailing was returned to sender when Plaintiff failed to update his current address." (Nov. 16, 2012 Letter at 1.)

[4]Plaintiff's original Complaint named additional defendants, but because these parties are not relevant to the disposition of Defendants' motions, they will not be discussed herein.  The Court will also not recount the full procedural history of this case as it has already been set forth in previous orders.  (See, e.g., Order Granting Plaintiff's First Mot. to Compel (the "First Compel Order"), Jan. 4, 2012, ECF No. 36.)

> (1) Plaintiff fail[ed] to state a cognizable § 1983 claim; (2) Defendant Officer Ueberacher [wa]s entitled to qualified immunity; (3) Plaintiff fail[ed] to state a claim for racial discrimination; (4) Defendants Raymond Kelly and Michael Bloomberg had no personal involvement in the incident alleged in the Complaint; (5) Plaintiff fail[ed] to state a <u>Monell</u> claim; [and] (6) the New York City Police Department [wa]s not a suable entity.

(Summ. J. Mem. at 3).  Defendants also requested that the Court decline to exercise its jurisdiction over any of Plaintiff's state law claims.  (<u>Id.</u>)

### B.  Plaintiff's First Motion to Compel

In response to Defendants' Rule 56 motion, Plaintiff submitted a motion to compel production of records that he considered material to his opposition to summary judgment.  (Mot. to Compel, ECF No. 30.)  Following briefing and letters from both parties, (<u>see</u> ECF Nos. 31-35), the Court issued an Order granting Plaintiff's motion to compel in its entirety, (First Compel Order at 12).  The Order directed Defendants to provide Plaintiff with:

> (1) The entire SPRINT report and [the audio-taped] 911 call (or [to] provide sufficient evidence that an appropriate search . . . [was] made and that th[e records] do not exist; and

> (2) Evidentiary support for [Officer] Ueberacher's assertion that prior to March 9, 2009, he had been advised by his command "that there had been a recent spike of burglaries" in the vicinity of West 123rd Street between Marcus Garvey Park West and Malcolm X Boulevard, and that the burglaries often occurred "during the midday hours, and involved items that c[ould] easily be concealed in bags and knapsacks."

(<u>Id.</u> (citing Ueberacher Decl. ¶ 2) (alterations in original omitted).)

In accordance with the Court's Order, Defendants provided Plaintiff with: (1) a copy of his March 12, 2009 FOIL file showing that the his 911 call records had been searched for on August 11, 2009; (2) a copy of the NYPD's audio retention policy stating that the NYPD records all 911 calls and digitally stores them on a voice recording system for 180 days, at which point a

computer program automatically deletes them; and (3) proof that the audio file of Plaintiff's 911 call no longer existed because the call had been recorded more than 180 days prior to the Court's Order.  (See Feb. 23, 2012 Letter.)  Additionally, Defendants provided Plaintiff with an affidavit from Sergeant Cuadrado.  (See id. Ex. C ("Cuadrado Aff." dated Jan. 25, 2012).)  In the Affidavit, Sergeant Cuadrado stated that, as the Patrol Sergeant for the NYPD's 28th Precinct from December 2008 until November 2010, she "was responsible for informing the officers under [her] command of crimes that had occurred within the confines of the precinct, and the locations of the crimes."  (Id. ¶ 3.)  She explained that "[t]he purpose of informing them of such, was so that when the officers went on patrol, they would pay special attention to the areas where crimes had been occurring."  (Id.)  Sergeant Cuadrado also stated:

> From approximately March 1, 2009 to March 9, 2009, I informed the patrol officers at the start of their tours, including Police Officer Ueberacher, that there was a spike in residential burglaries within the confines of the 28th Precinct, which includes the vicinity of Marcus Garvey Park West and Malcolm X Boulevard in Manhattan. The officers, including Police Officer Ueberacher, were informed that many of these burglaries were occurring during the daytime hours, and involved stolen items that could easily be concealed in a backpack or duffle bag.

(Id. ¶ 4.)

## C.  The Amended Complaint

On January 27, 2012, Plaintiff sought leave to amend his original Complaint so that he could add claims related to his March 12, 2009 FOIL request.  (Not. of Mot. to Am. Compl. at 1, 3-4, ECF No. 37.)  The Court granted Plaintiff leave to amend on March 13, 2012.  (Order, Mar. 13, 2012, ECF No. 40.)  On April 2, 2012, Plaintiff filed his Amended Complaint, alleging that the City of New York had violated Plaintiff's Fifth Amendment due process rights by maintaining a policy of not time-stamping any FOIL requests, (id. ¶ 109), and that Officer Rivera had violated Plaintiff's Fifth Amendment due process rights by refusing to time-stamp his

particular FOIL request, (id. ¶¶ 111-14).  In addition, the Amended Complaint alleged that

Officer Pimentel had violated Plaintiff's Fifth Amendment rights by withholding the burglary

data and the 911 call records requested by Plaintiff. [5]  (Id. ¶¶ 109.)

On April 16, 2012, Defendants filed an Answer to Plaintiff's Amended Complaint.  The

Answer included a footnote, arguing that Defendants' July 22, 2011 summary judgment motion

remained pending, and that Plaintiff's claims should all be dismissed for the reasons set forth in

their summary judgment motion and in letters that they had sent to the Court on February 23,

2012 and March 9, 2012.  (Answer at 1 n.3.)  In an Order dated April 20, 2012, the Court

directed Defendants to "serve and file a separate submission stating these grounds explicitly so

[that] Plaintiff [could] ha[ve] notice of Defendants' grounds."  (Order, Apr. 20, 2012, ECF No.

44.)  Thereafter, on May 5, 2012, Defendants filed a Rule 12(c) motion to dismiss the FOIL-

related claims that Plaintiff had included in his Amended Complaint.  (Dismiss Mem. at 2.)  As

to Plaintiff's other claims arising from the March 9, 2009 incident with Officer Ueberacher,

Defendants "respectfully refer[ed]" Plaintiff and the Court to the summary judgment motion that

they had filed on July 22, 2011, and to the February 23, 2012 letter and March 9, 2012 letter

attached to their motion to dismiss.  (Id.; see also Dismiss Mem. Exs. C & E.)

### D.  Plaintiff's Request for a Second Order to Compel

After Defendants filed their motion to dismiss, Plaintiff submitted multiple letters to the

Court requesting additional discovery and seeking an extension of time in which to respond to

---

[5]When filed, Plaintiff's Amended Complaint named Officer Rivera and "NYPD X" as the defendants involved in the
processing of his March 12, 2009 FOIL request.  (Am. Compl. at 1.)  Plaintiff later requested that "NYPD X" be
identified as Officer Christine Pimentel.  (Pl.'s Letter to the Court, July 2, 2012, ECF No. 55.)  Defendants opposed
this request "because the three year statute of limitations for [Plaintiff's] claim pursuant to § 1983 against Pimentel
had lapsed."  (Defs.' Letter to Court at 1, Aug. 10, 2012, ECF No. 56.)  By Order dated November 5, 2012, this
Court granted Plaintiff's request to substitute Officer Pimentel with "NYPD X" without prejudice to Defendants'
Motion to Dismiss on statute of limitation grounds.  (Order at 4, Nov. 5, 2012, ECF No. 59.)

"Defendants' summary judgment motion."  (<u>See</u> Letter from Plaintiff to Court dated May 17,

2012, ECF No. 52; <u>see also</u> Order ("Second Compel Order"), Nov. 5, 2012, ECF No. 59

(summarizing letters filed by Plaintiff on May 17, July 2, and Aug. 22, 2012, as well as

Defendants' Aug. 10, 2012 response letter).)  In one of his letters, Plaintiff reported that

Defendants had failed to provide him with (1) a copy of Officer Ueberacher's Stop & Frisk

Report; (2) the burglary data that he had requested in his March 12, 2009 FOIL request and upon

which Sergeant Cuadrado had relied in her Affidavit; and (3) the park attendance records that he

had asked for in his April 13, 2012 FOIL request.  (<u>See</u> Letter from Plaintiff to Court dated July

2, 2012, ECF No. 55.)  Thus, on November 5, 2012, the Court issued an order directing

Defendants to produce these records to Plaintiff.  (Second Compel Order at 3-4.)

Accordingly, on November 16, 2012, Defendants submitted a copy of Officer

Ueberacher's Stop & Frisk Report and a copy of Plaintiff's park attendance "Membership

Usage" records.  (<u>See</u> Nov. 16, 2012 Letter Exs. A & B; <u>see also</u> <u>supra</u> n.4.)  In the letter

transmitting these materials, Defendants stated that they were "unaware of any 'data' . . . relied

on by Sergeant Cuadrado," but that they were "continuing to look into this matter."  (<u>Id.</u> at 1.)

Defendants closed their letter by requesting that their "July 2011 motion for summary judgment

and [their] May 2012 motion to dismiss be granted."  (<u>Id.</u> at 2.)  The Court then directed

Defendants to "advise [it] and Plaintiff of the result of their investigation [into the burglary data]

by December 7, 2012."  (<u>See</u> <u>id.</u> at 3 (endorsement by Court).)  Thus, on December 7, 2012,

Defendants submitted a letter stating that they remained unaware of any specific data relied on

by Sergeant Cuadrado because "the information she [had] conveyed to the police officers under

her command . . . was generated by word-of-mouth, and communicated verbally among

supervisors." (Letter from Defs. dated Dec. 7, 2012, ECF No. 64.)  The Court issued an Order

directing Plaintiff to file any further papers by February 4, 2013.  (Order, Jan. 24, 2012, ECF No.

65.)  Plaintiff did not submit any additional papers to the Court, and the issues are now deemed to be fully briefed.

**III.     APPLICABLE LAW – 42 U.S.C. § 1983**

    **A.  Individual Liability**

Section 1983 provides a remedy to persons who, under color of state law, have been deprived of "any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  The Supreme Court has explained that "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992).  Thus, in order to be held liable under § 1983, a state actor must be, or have been, personally involved in the violation alleged.  See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.").  When a state actor is sued under § 1983 for being personally involved in a constitutional violation, he may be granted qualified immunity from suit.  See Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) (explaining rationale behind offering government officials qualified immunity).  To determine if a state actor is entitled to such immunity, a court must decide (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right;" and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct."  Pearson v. Callahan, 555 U.S. 223, 232 (2009) (internal references omitted).  A court may approach this two-pronged analysis in whatever order that it deems appropriate.  Id. at 236.

**B.  Municipal Liability**

Conversely, a plaintiff seeking to sue a municipality under § 1983 must show that an identified municipal "policy," "custom," or "practice" was the "moving force" behind the harm alleged.  See Monell v. New York Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  It is not enough for a plaintiff to allege that a municipality's employee acted unconstitutionally in a single instance, or that a municipality's employees are guilty of some wrongdoing.  See id. at 691 ("A municipality cannot be held liable under § 1983 on a respondeat superior theory.").  Rather, a plaintiff must prove (1) that a written discriminatory policy exists; or (2) that "the discriminatory practices of city officials are . . . so permanent and well settled as to constitute a custom or usage with the force of law;" or that (3) "the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers."  Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992) (internal quotation marks omitted).

**IV.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A.  Legal Standard[6]**

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper if, viewing all facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication."  Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996); see also Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010)

---

[6]The Court is mindful that Plaintiff is proceeding pro se in this civil rights action.  Plaintiff's submissions will therefore be held to "less stringent standards than formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007); see also Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) ("[T]he pleadings of a pro se plaintiff must be read liberally and should be interpreted to raise the strongest arguments that they suggest.") (internal quotation marks omitted).  The Court's liberal construction of Plaintiff's submissions does not, however, relieve Plaintiff of his burden to show that his pleadings contain factual allegations sufficient to raise a "right to relief above the speculative level."  See Bridgewater v. Taylor, 698 F. Supp. 2d 351, 357 (S.D.N.Y. 2010) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Nor does a party's pro se status relieve him from the usual summary judgment requirements.  See Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995).

(explaining that "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and that "[a] fact is material if it might affect the outcome of the suit under governing law").  A party moving for summary judgment bears the burden of proving that no genuine issue of material fact exists, or that the evidence supporting the non-moving party's case is so slight that no rational jury could find in the non-moving party's favor.  See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  The party opposing summary judgment must then come forward with facts sufficient to show that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  In so doing, the opposing party must show more than "[t]he mere existence of a scintilla of evidence in support of [its] position."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

**B.  Plaintiff's Fourth Amendment Claim**

Plaintiff's Fourth Amendment claim alleges that Officer Ueberacher stopped Plaintiff "without reasonable or probable cause to believe a crime had been, was being, or was about to be committed and without reasonable or probable cause to believe that Plaintiff had committed, was committing, or was about to commit a crime."  (Am. Compl. ¶ 104.)  The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const., amend. IV.  The Supreme Court has made clear that a "seizure" occurs when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  United States v. Terry, 392 U.S. 1, at 19 n.16 (1968).  "The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  California v. Hodari D., 499 U.S. 621, 628 (1991) (citing United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  Said another way,

Fourth Amendment scrutiny is triggered when a reasonable person would have believed that he was not free to leave and go about his business.  See INS v. Delgado, 466 U.S. 210, 215 (1984).

Where an individual does not consent to a police encounter and a police officer has reasonable articulable suspicion that "criminal activity may be afoot," the Fourth Amendment permits that officer to briefly detain and question a person for investigative purposes.  See Terry, 392 U.S. at 30.  For such an investigative stop, reasonable suspicion demands that an officer be "able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989).  Reasonable suspicion may, however, be based on "a series of acts, each perhaps innocent in itself, but which taken together warrants further investigations."  Terry, 392 U.S. at 22.

> i.  The encounter between Officer Ueberacher and Plaintiff constituted an investigative stop under the Fourth Amendment.

As the party opposing summary judgment, Plaintiff is entitled to have the evidence construed in the light most favorable to him and to have all inferences drawn in his favor.  See Thomas, 165 F.3d at 142.  Thus, for the purpose of deciding Defendants' summary judgment motion, the Court assumes that, as Plaintiff asserts, Officer Ueberacher told Plaintiff that he was not free to leave the scene of his encounter with Officer Ueberacher.  (See Am. Compl. ¶¶ 34-35, 43-44.)  The Court also assumes that, when the four unnamed responding 911 officers arrived at the scene, they stood around Plaintiff in a threatening semi-circle and at least one of these officers told Plaintiff that he was not free to leave.  (Id. ¶¶ 50-52.)  Under these circumstances, a reasonable person would not have felt free to disregard the police and to go about his business. See Hodari D., 499 U.S. at 628.

In addition, the Court notes that Plaintiff reported not feeling free to leave the scene and that he did not actually leave the scene until Sergeant Cuadrado told him that he could go.  (Am.

Compl. ¶¶ 53-57.)  The Court further notes that Officer Ueberacher completed a report for the NYPD's Stop, Question & Frisk System after his encounter with Plaintiff, a fact which suggests that Officer Ueberacher also viewed the encounter to be non-consensual.  (See Nov. 16, 2012 Letter Ex. B.)  Thus, considering these factors together, it is clear that Plaintiff did not consent to the encounter with Officer Ueberacher.  Fourth Amendment scrutiny is therefore required as to whether Officer Ueberacher had reasonable articuable suspicion to perform an investigative stop on Plaintiff.  See Mendenhall, 446 U.S. at 553-54 (concluding that "foundation . . . for invoking constitutional safeguards" exists "only when" an individual shows that his freedom of movement has been restrained by "means of physical force or a show of authority"); see also Terry, 392 U.S. at 30.

> ii.  Officer Ueberacher had reasonable articuable suspicion to perform an
>      investigative stop on Plaintiff.

Both Plaintiff and Officer Ueberacher agree that Officer Ueberacher approached Plaintiff only after observing him "put his bag down, bend over his bag, move his arms about his bag, pick up the bag, and proceed west."  (Am. Comp. ¶ 12; see also Ueberacher Decl. ¶ 2.)  Officer Ueberacher stated that he was suspicious of Plaintiff's activities at that time because the front door of a building at 6 or 10 West 123rd Street was ajar—an observation which Plaintiff has not contradicted.  (See Ueberacher Decl. ¶ 2.)  Officer Ueberacher also stated that he was particularly suspicious of Plaintiff's activities because he had previously been told by his commanding officer of "a recent spike in burglaries" in the location around where Plaintiff was observed and that the "suspects committing these burglaries often str[uck] during the midday hours and st[ole] items that c[ould be] easily be concealed in bags and knapsacks."  (Id.)  To this end, at or around the time of the incident, Officer Ueberacher recorded in his Stop & Frisk Report that he had observed Plaintiff in an area with a "high incidence of reported offense."

(Nov. 16, 2012 Letter Ex. B.)  Moreover, the affidavit submitted by Sergeant Cuadrado confirms that, prior to March 9, 2009, she was also aware of, and did in fact inform, Officer Ueberacher about the burglary pattern in the area. (Cuadrado Aff. ¶ 4.)

Although Plaintiff's presence in the "high-crime area" where he was observed, is not, by itself, sufficient to justify the investigative stop at issue here, the fact that Officer Ueberacher had been told about a recent spike in midday burglaries—taken together with the undisputed facts that a front door near to Plaintiff was open and that near to this open door, Plaintiff was observed bending over his duffle bag and moving his arms about his bag—establish that Officer Ueberacher had reasonable suspicion to briefly stop and question Plaintiff.[7]  (See Am. Compl. ¶¶ 7, 11; Ueberacher Decl. ¶ 2); see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); Floyd v. City of New York, 813 F. Supp. 2d 417, 442-43 (S.D.N.Y. 2011) (concluding that officers had reasonable suspicion to stop and frisk two men whom they observed attempting to unlock front door of a house with a number of different keys in a location that had a midday burglary pattern).

Moreover, the scope and duration of the investigative stop that Officer Ueberacher performed on Plaintiff was reasonable in light of Officer Ueberacher's articulable suspicion.  See United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) ("If an investigative detention is properly premised upon articulable suspicion, the next inquiry is whether its scope and duration are reasonable.").  The encounter between Plaintiff and Officer Ueberacher lasted less than twenty minutes, including the time that Plaintiff waited for the arrival of Sergeant Cuadrado, whose

---

[7]In arriving at this conclusion, the Court does not reach the question of whether Plaintiff was standing in the courtyard of a building at 6 or 10 West 123rd Street or on the public sidewalk in front of a building at 6 or 10 West 123rd Street.

presence he had requested, and the officers who were responding to his 911 call.  See Florida v. Royer, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.").  Moreover, the questions that Officer Ueberacher asked Plaintiff were appropriately tailored to his articulable suspicion about Plaintiff's actions.  See Terry, 392 U.S. at 20 (explaining that an investigative stop must be "reasonably related in scope to the circumstances which justified the intervention in the first place").  Finally, the investigative stop performed on Plaintiff was limited to Officer Ueberacher's questions alone, as Plaintiff was not frisked, searched, or handcuffed during the encounter.  Cf. Royer, 460 U.S. at 500 (requiring that whatever investigative methods are employed be "the least intrusive means reasonably available to verify or dispel [an] officer's suspicion in a short period of time").

Thus, for the reasons just discussed and in light of the totality of the circumstances presented, the Court concludes that Officer Ueberacher had reasonable articulable suspicion to approach, briefly detain, and question Plaintiff.  See United States v. Arvizu, 534 U.S. 266, 273 (2002) (A court "must look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.").  Moreover, because neither the duration nor the scope of Officer Ueberacher's investigative stop was unreasonable, summary judgment is granted to Defendants on Plaintiff's Fourth Amendment claim against Officer Ueberacher.[8]

### C.  Plaintiff's Fourteenth Amendment Claims

Summary judgment is likewise granted to Defendants on Plaintiff's Fourteenth Amendment claims.  (See Am. Compl. ¶¶ 65, 102, 106.)  The Fourteenth Amendment prohibits a

---

[8]Because Officer Ueberacher did not violate Plaintiff's Fourth Amendment rights, there is no need to consider if Officer Ueberacher is entitled to qualified immunity.

state from depriving any person of life, liberty, or property without due process of law and it also prohibits a state from denying any person equal protection of the law.  U.S. Const., amend. XIV. Here, Plaintiff claims that the encounter with Officer Ueberacher on March 9, 2009 led to the violation of his Fourteenth Amendment rights by Officer Ueberacher, the City of New York, Mayor Bloomberg, and Commissioner Kelly.  (Id. ¶ 106.)  In addition, Plaintiff claims that the NYPD, Mayor Bloomberg, and Commissioner Kelly violated his Fourteenth Amendment rights by "adopting, condoning, orchestrating, and executing a policy of seizing Blacks in Harlem and throughout the City of New York without probable or reasonable cause to believe such Blacks have committed, are committing, or are about to commit a crime."[9]  (Id. ¶¶ 65, 102.)

        As has just been shown, however, Officer Ueberacher had reasonable articuable suspicion to perform the brief investigative stop at issue here.  By contrast, Plaintiff has not shown that Officer Ueberacher had reasonable suspicion to stop, but then declined to stop, the white passerby.  Accordingly, Plaintiff has failed to show that Officer Ueberacher violated his Fourteenth Amendment equal protection rights by impermissibly stopping him on the basis of his race, or on any other improper ground.  See Floyd, 813 F. Supp. 2d at 444 (dismissing equal protection claim against defendant officers where court found that officers had reasonable suspicion to perform investigative stop).  Similarly, because Officer Ueberacher's investigative stop was lawful, Plaintiff has not shown that the City of New York or the NYPD[10] maintained an

---

[9]Plaintiff raises this claim without identifying a specific cause of action, but the Court construes Plaintiff's claim to be made under the Fourteenth Amendment's equal protection clause.  See Graham, 89 F.3d at 79 (emphasizing that a pro se plaintiff's pleadings must be read liberally and interpreted to raise strongest arguments that they suggest).

[10]In addition to failing on the merits, all of Plaintiff's claims against the NYPD must be dismissed because, pursuant to New York City's Charter, the NYPD is not a suable entity.  See N.Y. City Charter § 396.  Section 396 of the Charter specifically states that "[a]ll actions and proceedings for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."  Id.; see also Williams v. New York City Police Dep't, 930 F. Supp. 49, 54 (S.D.N.Y. 1996) ("As an agency of the City of New York, the Police Department is not a suable entity."); East Coast Novelty Co., Inc. v. City of New York, 781 F.

unlawful, racially-motivated municipal policy, custom, or practice that caused the deprivation of his Fourteenth Amendment rights.  See Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985) (requiring that, if § 1983 municipal liability is to attach, a "causal connection" between a municipality's policy and the deprivation of a plaintiff's constitutional rights must be established), cert denied, 480 U.S. 916 (1987).

Nor has Plaintiff shown that Mayor Bloomberg or Commissioner Kelly adopted a racially-motivated municipal policy or were otherwise personally involved in Plaintiff's encounter with Officer Ueberacher.  See Iqbal, 556 U.S. at 676 (requiring a plaintiff to "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Plaintiff's Amended Complaint, for example, does not allege that either Mayor Bloomberg or Commissioner Kelly was physically present at or near the West 123rd Street location where Plaintiff's encounter with Officer Ueberacher took place; and it also fails to include any allegations that either defendant directly participated in the investigative stop that Officer Ueberacher performed on Plaintiff.  See Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987) (affirming dismissal of claims against defendants where complaint failed to include allegations of personal involvement in the underlying constitutional violations).

Finally, the Court notes that the injunctive relief requested by Plaintiff on his Fourteenth Amendment claims is mooted by New York State law.  Specifically, Plaintiff requests that the Court order the City of New York, Mayor Bloomberg, and Commissioner Kelly to "purge and effect a complete erasure of the information in [a] 'profiling database'" that Plaintiff alleges the City maintains.  (Am. Compl. § 103.)  But Article 140.50 of New York Criminal Procedure Law already forbids a police officer from recording in a computerized or electronic database the

---

Supp. 999, 1010 (S.D.N.Y. 1992) (dismissing claims against NYPD because district court found that New York City Charter precluded such action against the agency).

name, address, or social security number of a person, such as Plaintiff, who has been stopped,

questioned, or frisked by a police officer, but is then released without further legal action.  <u>See</u>

N.Y. Crim. P. Law § 140.50(4) (McKinney).  Indeed, Plaintiff's own name was not even

recorded by Officer Ueberacher in the Stop & Frisk Report.  (<u>See</u> Nov. 16, 2012 Letter, Ex. B.)

### D.  Plaintiff's Ninth Amendment Claim

Defendants are also granted summary judgment on Plaintiff's Ninth Amendment claim,

alleging that Officer Ueberacher, Mayor Bloomberg, and Commissioner Kelly, by "racially

profiling and targeting Plaintiff for seizure and search, used state power to assault Plaintiff's

value, esteem, worth, and nature as a human being, which assault amounted to an assault on

Plaintiff's dignity."  (Am. Compl. ¶ 107.)  Also unsuccessful is Plaintiff's separate claim against

the City of New York, Mayor Bloomberg, Commissioner Kelly, and Officer Pimentel for a

"declaratory judgment that the Ninth Amendment protects the individual right to dignity and that

racial group profiling necessarily assaults an individual's dignity as a human being."  (<u>Id.</u> ¶ 108.)

The Ninth Amendment states that "[t]he enumeration in the Constitution, of certain

rights, shall not be construed to deny or disparage others retained by the people."  U.S. Const.,

amend. IX.  Plaintiff's claims under this amendment fail because the Ninth Amendment is "not

an independent source of individual rights."  <u>Jenkins v. C.I.R.</u>, 483 F.3d 90, 92 (2d Cir. 2007).

Rather, the amendment "provides a 'rule of construction,'" which "dictates that 'the full scope of

the specific guarantees in the Constitution is not limited by the text, but embraces their

purpose.'"  <u>Id.</u> (quoting <u>United States v. Bifield</u>, 702 F.2d 342, 349 (2d Cir. 1983)).  Accordingly,

the Ninth Amendment "cannot serve as the basis for a § 1983 claim," and Plaintiff's claims

under this Amendment must be dismissed.  <u>See</u> <u>Brown v. City of New York</u>, No. 11 CIV 1068,

2013 WL 491926, at *4 (S.D.N.Y. Feb. 8, 2013) (dismissing § 1983 claim premised on violation

of Ninth Amendment); <u>see also</u> <u>Subgidio v. Graiani</u>, No. 05 CIV 4065, 2006 WL 648229, at *7

(S.D.N.Y. Mar. 16, 2006) (holding that a Plaintiff's Ninth Amendment claim failed "because that amendment cannot be enforced by means of an action under § 1983").

### E.  Plaintiff's Claim Pursuant to 42 U.S.C. § 1981

In addition to the § 1983 claims just discussed, Defendants have also moved for summary judgment on Plaintiff's § 1981 claim against Officer Ueberacher.  (Summ. J. Mem. at 12-13.) Specifically, Plaintiff alleges that Officer Ueberacher, by offering and then "refus[ing] to seize a white person as he had seized Plaintiff," denied Plaintiff "the same right to be secure in his person, papers, and effects from unreasonable seizures as is enjoyed [by] white citizens."  (Am. Compl. ¶ 105.)

Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

§ 1981(a).  "The statute has long been viewed as prohibiting certain forms of discrimination based on race, and its reference to rights enjoyed by white citizens establishes the racial character of the rights being protected."  Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988) (internal citations and quotation marks omitted).  Thus, to establish a claim under § 1981, a plaintiff must allege facts showing that: (1) the plaintiff is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute.  See Mian v. Donaldson, Lufkin, Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).

Here, given that Officer Ueberacher had reasonable articulable suspicion to perform a brief investigative stop on Plaintiff, Plaintiff has failed to show that Officer Ueberacher "had an intent to discriminate against him on the basis of race."  See id.  Furthermore, the fact that

Officer Ueberacher did not stop the white passerby as Plaintiff requested, (see Am. Compl. ¶¶ 36-41), does not give rise to the inference that Officer Ueberacher stopped Plaintiff on the basis of his race. The circumstances in which this passerby was allegedly observed were not reasonably comparable to those surrounding the investigative stop of Plaintiff. Indeed, the white passerby was not observed standing in front of an open door, nor was there reason to believer he was placing any potentially stolen items in a bag. In fact, he was reported to be carrying only a clipboard, (id. ¶ 41), thus making it unlikely that he was concealing stolen items. Hence, Defendants are granted summary judgment on Plaintiff's Section 1981 claim.

## V.    DEFENDANTS' RULE 12(c) MOTION TO DISMISS

### A.  Legal Standard

Rule 12(c) provides that, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c); see also Patel v. Searles, 305 F.3d 130, 135 (2d Cir. 2002). In considering a Rule 12(c) motion, a court applies "the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999). Thus, a pleading will survive a Rule 12(c) motion only if it is supported by allegations that put forth underlying facts sufficient to state a claim to relief that is "plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." Iqbal, 556 U.S. at 678. In considering a motion to dismiss, a court must disregard claims that amount only to "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," id., and must confine its consideration to the pleadings and any matters that are subject to judicial notice, see Fed. R. Civ. P. 12(d).

23

**B.  Plaintiff's FOIL-Related Due Process Claims**

Plaintiff claims that the City of New York violated his Fifth Amendment procedural due process rights by maintaining a policy of not time-stamping any FOIL requests, (id. ¶ 109), and that Officer Rivera violated his Fifth Amendment due process rights by refusing to time-stamp his particular FOIL request, (id. ¶¶ 111-14).  Plaintiff contends that Officer Rivera's refusal to time-stamp his FOIL submission was "for the purpose of thwarting Plaintiff's ability to obtain burglary information in relation to an instance of racial profiling."  (Id.)  In addition, Plaintiff alleges that Officer Pimentel violated his due process rights by withholding the burglary data and the 911 call records that he had requested in his FOIL request on March 12, 2009.  (Id. ¶¶ 115-16, 80-86.)

This Court is without jurisdiction to consider Plaintiff's FOIL-related claims and thus Defendants' request to dismiss these claims will be granted.  Under New York state law, if an agency or government official fails to comply with the provisions of FOIL, the person submitting the FOIL request must pursue an administrative appeal or seek remedies in state court pursuant to N.Y. C.P.L.R. Article 78.  See N.Y. Pub. Off. Law § 89; see also Schuloff v. Fields, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997) ("The appropriate vehicle for challenging denials of access guaranteed by [FOIL] is a state court proceeding pursuant to N.Y. C.P.L.R. Article 78 upon exhaustion of administrative remedies."); Sonds v. Cuomo, No. 9:11 CIV 895, 2012 WL 952540, at *3 (N.D.N.Y. Feb. 3, 2012) ("Plaintiff's state FOIL request cannot be the basis of a federal action."); Zimmelman v. Teachers' Ret. Sys. of City of New York, No. 08 CIV 6958, 2010 WL 1172769, at*14 (S.D.N.Y. Mar. 8, 2010) (ruling that where a plaintiff has not exhausted his remedies under an administrative appeal process, a federal court has no jurisdiction to consider an alleged failure to comply with city policies).

In addition, assuming <u>arguendo</u> that Plaintiff could bring his FOIL-related claims in this Court and that Plaintiff could also show that either the City maintained a policy of refusing to time-stamp FOIL requests or that Officer Rivera refused to time-stamp Plaintiff's particular FOIL submission, Plaintiff's FOIL-related claims would still fail.  Plaintiff, in order to make out a due process claim for property deprivation, must show that he had a federal protectable property interest.  <u>See</u> <u>Matthews v. Eldridge</u>, 424 U.S. 319, 332 (1976).  But, as several courts within this Circuit have found, "a plaintiff has no property interest in obtaining FOIL documents."[11]  <u>Blount v. Brown</u>, No. 10 CIV 01548, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010); <u>see also</u> <u>Billups v. Millet</u>, No. 91 CIV 6326, 1996 WL 99399, at *4 (S.D.N.Y. Mar. 6, 1996) ("FOIL documents are an expectation . . . . [and New York state law] does not require that documents be produced as of right, but only after request and investigation."); <u>Webb v. Ashburn</u>, No. 96 CIV 0325, 1997 WL 118355, at *5-6 (S.D.N.Y. Mar. 17, 1997) (same).  Likewise, Plaintiff's allegations about Officer Pimentel would also fail on the merits.  Plaintiff, who acknowledges that he specified the wrong 911 call date in his FOIL request, offers no support for his conclusory allegation that Officer Pimentel failed to inform him about having located the SPRINT report and audio-taped recording of his 911 call because she "was aware of, condoned, and supported the City of New York's Stop-and-Frisk-Black-people policy."  (<u>Id.</u> ¶¶ 83, 85-87.)

---

[11]Additionally, even though submissions beyond the pleadings may not be considered in deciding Defendants' motion to dismiss, the Court notes in passing that Plaintiff has also not shown any causal connection between the deprivation of his constitutional rights and the City's alleged time-stamping policy or the refusal of Officer Rivera to time-stamp his FOIL request.  On April 13, 2009, the NYPD FOIL Unit sent Plaintiff a letter acknowledging the submission of his March 12, 2009 FOIL request, and on August 11, 2009, the NYPD FOIL Unit sent Plaintiff a letter stating that their search had returned negative results.  (<u>See</u> Feb. 23, 2012 Letter Ex. B.)  These facts show that the City responded appropriately to Plaintiff's FOIL request.

## VI.   STATE LAW CLAIMS

The Court, having dismissed or entered summary judgment on all of the federal claims alleged in Plaintiff's Amended Complaint, now dismisses all of the pendent state law claims, (see Am. Compl. ¶¶ 94-97), alleged therein pursuant to 28 U.S.C. § 1367(c)(3).  See Pitchell v. Callan, 13 F.3d 545, 547 (affirming district court's dismissal of pendent state law claims on basis that "[i]t is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims"); see also Carnegie-Melon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.).

## VII.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment and motion to dismiss are granted.  Plaintiff's Amended Complaint is hereby dismissed with prejudice.


IT IS SO ORDERED.

Dated: New York, New York
      June 3, 2013

Robert P. Patterson, Jr.
U.S.D.J.

26

**Copies of this Order were sent to:**

<u>Pro Se Plaintiff</u>
Posr A. Posr (by mail)
One Bayview Avenue
Howard Beach, NY 11414

<u>Counsel for Defendants</u>
Brian Jeremy Farrar (by fax)
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
Email: bfarrar@law.nyc.gov
Tel: (212)-341-0797
Fax: (212)-788-0367